Judge Fischer and I are privileged today to have sitting with us for the first time on the Court of Appeals, sitting by designation Judge Sanchez. And Judge Sanchez, as I said to you before we came in, I really look forward to sitting with you and hope you come back many, many times. We'll have our first case for today is Pollard v. Yost, number 08-4720. Mr. Matusky and Ms. Irwin. Yes, Your Honor. Testing one. Were we getting feedback? Yes. Okay, great. May it please the Court, my name is Patrick Matusky. I represent. Hang on for one second. We're getting some feedback. Let me call somebody real quick. Okay. Let's just hold off for a second. Yes, Your Honor. Unless you like the echo. It's kind of cool sometimes. Somewhat distracting. You know what we may want to do? Just take a five-minute recess. What do you think, Mike? Yeah. Well, I'll tell you what. We're going to take a five-minute recess. We'll come back once I get it resolved and start all over again. Please rise. This Court stands recessed for five minutes. Do it again. May it please the Court. My name is Patrick Matusky. I represent the appellant petitioner, Melvin Pollard. Just have your voices a little bit so we make sure we hear you. The fundamental issue in this case is whether the so-called Savings Clause of 28 U.S.C. under Section 2255A, which permits a prisoner resort to the great writ of habeas corpus under Section 2241, when the procedure by motion under 2255 is inadequate or ineffective to test the legality of the prisoner's detention. So he enters into a plea agreement. The career offender status, if that applies, is what, 292 months to 330-some months? Is that right? There was a range of sentencing, Your Honor, at a criminal history category of six that was imposed. And what would the range of sentencing have been without career offender status? There's a debate in the record. Mr. Pollard took the position that it would have been at the level of three. The government has said that it would have been at the level of four. So whether it be three or four, roughly, what would the range of sentencing guidelines range have been, had we been under the sentencing guidelines? I believe the government's assertion under Category 4 was between 235 and 292 months. Mr. Pollard was sentenced under an agreement. And if it was three, what would it have been? I'm not sure, Your Honor. It would have been 210 months at the low end. And he got 194. He got 194 months. That's correct, Your Honor. Just so you're working backwards, isn't that the big problem you have here, is that we don't know if he really, and he claims at one point, I think, in your briefing, that he lost four and a half years. But we really don't know that, do we? Well, we took that statement from the magistrate judge's report and recommendation that became the opinion of the lower court, that had he not been found liable for a controlled substance offense, which served to enhance his conviction, that he would have, in fact, been sentenced to a lower sentence. Would the government still have done the 5K1.1 if he wasn't at career offender status? I see no reason why the government would not have done so. If they were prepared to enter into an agreement at two-thirds of the low end of the applicable sentencing guidelines because of his cooperation, in a context where it was assumed that he was a career offender, why would they not have been willing to give him the same benefit of that doubt in the context where he was, in fact, not a career offender, as demonstrated by what we contend is a subsequent authoritative decision by the United States Court of Appeals for the Sixth Circuit in Montanez that makes it very clear that this prior 1983 Ohio State conviction was not a controlled substance offense. It was clearly an offense of possession only. It clearly did not require possession with intent. There's no doubt Montanez helps you, although Montanez came out, what, two, three, almost four years after he pled. Yes, Your Honor. It came out well after he had filed his initial Section 2255 motion. And lost in the Seventh Circuit.  He did not. But that was all without the benefit of Montanez. Let's go back to that, Mr. Matusky. You've done a fine job for your client in advancing these arguments, both in your brief and I'm sure here today. But the district court in the Northern District of Illinois, on the first habeas that was filed, had before it the question of the plea waiver. And that court made a determination that, in fact, the plea waiver was effective. Now, why doesn't that bar any of the issues that you're trying to raise about 2255E? Well, we say the question of the, if governed by this court's cases, in Katak and Mabry, and it has to be both voluntary and knowing, and it must also, if enforced, not work. Yes, but isn't there, aren't we bound by the decision, which was not overturned on appeal in the Northern District of Illinois, that the plea waiver was, in fact, effective? And isn't that what the district court in this case found? The same, well, I'm not sure that the district court did find that. Well, they found there was no jurisdiction. The court, I believe, found a lack of jurisdiction because of an inability to demonstrate, a perceived inability to demonstrate, that the prior Section 2255 motion was inadequate or ineffective to test the legality of his detention. Both the prior determinations with respect to the enforceability of the waiver of collateral review rights and the prior determination about the adequacy or ineffectiveness of the Section 2255 motion were made without the benefit of the subsequent authoritative decision in Montanez. Go ahead. Before Montanez, there were two cases that addressed similar issues, and they were conflicting. Why couldn't he have raised that issue in his original 2255? I say to that, Your Honor, that he could have raised that issue to the same extent that Petitioner Dorsainville could have raised the question about the meaning of the word use in the firearm statute under which he was prosecuted. But, Dorsainville, that's a claim of actual innocence. A little bit different than the claim that we have here, isn't it? There is a distinction that's made in the lower court's opinion and in the government's brief between innocence of the crime and innocence of the sentence. And the contention is made that innocence of the crime might support a finding of inadequate and ineffectiveness to allow resort to 2241, whereas innocence of the sentence does not. We do not feel. There's an argument that, in a particular case, that, in effect, he's being held responsible for a predicate crime that could affect his sentence significantly if he gets career offender status. But the thing here is you have to show, to go under 2241, a miscarriage of justice. And it seems like that's an awful high hill to climb for this particular case because he was sentenced so significantly under what the guideline range was. It's as if he was sentenced not in connection with the guidelines but rather in connection with the plea agreement, going back to Judge Fischer's question. Well, the plea agreement did... And the waiver that's contained in it. Sorry. My fault. I apologize for speaking, Your Honor. As we see it, under the sentencing guideline scheme, in order to be a career offender, Mr. Pollard had to have been found to have committed two prior controlled substance offenses. We now know that one of those prior controlled substance offenses, a 1983 conviction, was not a controlled substance offense at all. The plea agreement was infected with a fundamental misunderstanding. But what happened here is what gums it up, maybe a bad choice of words, but he wasn't within 292 to 330-some months. This was a case that had a plea agreement. The court went along with it, bound by it, and he ended up getting 100 months below the minimum he otherwise would have qualified for. And so he benefited by his plea bargain, by his plea agreement. How can we say that that's a miscarriage of justice? Because even under that plea agreement, he is being confined for an additional three to four and a half years, depending upon where you put his actual criminal history range. We don't know that. I think we do know that, Your Honor. I think we do know that the sentence was enhanced by reason of his career offender status. I think we do know that if he were not a career offender, the guidelines, the applicable guidelines would have been lower. The government says, I believe, and please don't quote me on the numbers, but 235 months at the low end. Do we know that the plea agreement would have been any different? I see no reason why it should not have been different. What interest is there in the government in affording the kinds of two-third reduction from the low end of the sentencing guideline for the cooperation and the information that he provided, if he is a career offender, as opposed to if he is not a career offender? He, as I said again, this plea agreement was infected with a fundamental misunderstanding of the law. Okay, another problem I have with your argument, if you get to, let's call it the merits of the argument, is that, has there really been a change in the law? I mean, we decide questions of state law here all the time, but we're basically attempting to predict what the Supreme Court of that particular state, usually one of the states within our circuit, is going to say. Ohio never changed their interpretation of the statute. The Sixth Circuit changed the interpretation of the statute. I respectfully don't agree with that assessment of the case. I think the question is a federal question. The federal question is, what constitutes a controlled substance offense? Isn't it under Ohio law? The question is, what constitutes a controlled substance offense under Ohio law? Under Ohio law, there was a statute that said, if you possess an illegal drug in excess of... In bulk. In bulk. It was trafficking. If you possess more than X, it's trafficking. You have committed a crime. Ohio can interpret that statute any way it wants to. Some of the cases that Judge Sanchez referred to relied upon legally inapplicable labels to the statute about it being a drug trafficking offense, which the Sixth Circuit made clear is not the test for legislative interpretation, even under Ohio law. But the question is whether that statute constitutes a controlled substance offense under federal law. And that, I don't believe, Ohio can change that question of federal law. That is exclusively a federal law question. And I'm saying to this Court that we have an authoritative decision by the Sixth Circuit that, as far as I could tell, hasn't been changed or overruled. And as far as I can see, there's no credible argument that it is not correct. Even if you're correct on who's to interpret it? We're not bound by what the Sixth Circuit says. You certainly are not bound by the Sixth Circuit, and you certainly could reach a different result. But I am saying that that different result is theoretical and not realistic. And in a world of justice and where the standard is miscarriage of justice, the theoretical and the possibility shouldn't govern. What is real here is that Mr. Pollard was sentenced for a controlled substance offense that he did not commit, admittedly under an agreement. But the agreement calculus would have been wholly changed if the Montanez decision had been on the books. My problem is that you claim that the first time he became aware that he had that issue was when the Montanez decision was handed down. But before that decision, there were two cases that raised the issue as to whether the underlying predicate offense was sufficient for him to be characterized as a career offender. Couldn't he have raised that in his original sentence or in his original appeal or his habeas corpus, original habeas corpus? He could have raised it. So how can you argue that the vehicle for raising the issue on the 2255E is ineffective or inadequate? The same way it was ineffective, it were inadequate in Dorsainville. I think reading the Bailey decision and reading some subsequent Supreme Court authorities subsequent to Bailey, the law was unclear about what the meaning of the word use in that firearm statute was. And one case I read I believe was Boozley that addresses the ability for collateral relief in light of the Bailey decision, said that the federal reporters were replete with cases arguing what does the word use mean. So Mr. Dorsainville could have been Mr. Bailey. Somebody did it. Bailey did it. Bailey, whatever the clarity of the law was with respect to the meaning of that firearm statute, Bailey took it to the Supreme Court and the Supreme Court said, no, it requires active employment, not simply mere possession or not simply having the gun in the zone where it might be available in the course of the drug transaction. Dorsainville didn't do that either. So on the question of miscarriage of justice, I don't think that whether someone could have, you're going to get into a very difficult issue of who really could have raised it, who really should have raised it. The point was Mr. Pollard said that he was not a career offender. The record is completely unclear here as to whether that was based on some understanding about what constitutes a controlled substance offense or whether it was for some other reason that he simply disagreed that he was not a career offender. But he was not in a position to adequately and reasonably raise the argument in the absence of the Sixth Circuit decision and certainly was not in the same position that he would have been had the Sixth Circuit decision existed. And I doubt very much had it existed that the government would have insisted at plea bargain time and sentencing time to the sentencing judge before whom they stood that he is a career six criminal offender because of that enhancement. Therein lies the miscarriage of justice. And we are not asking to stretch the inadequate or ineffective language, inadequate or ineffective, to test the legality of this detention. Let's assume we did go under 2241. Let's assume that we say, okay, that's a good claim and that this rises to the level of a miscarriage of justice even though it applies to a sentencing. What's the remedy that you're asking us for? A resentencing? What is Mr. Pollard ultimately looking for? Well, at this stage, Your Honor, there's been a denial of the right to proceed under 2241 on jurisdictional grounds. Let's say you get all that. In the end, what's he looking for practically? Practically, he's looking for what is the obvious solution here, which is to find out what the guideline would have been, Your Honor. But in the end, isn't what you're asking for to go back for resentencing before? I guess we can't send it back to the Northern District of Illinois, but what do we do? What remedy? If you've got everything you want in terms of the legal aspects of this, practically what happens to Mr. Pollard? We cited a case called Maybeck, a Fourth Circuit case. It's not an inadequate or ineffective case. It's a case about habeas review under 2255 in the first instance. And the court said that a sentencing enhancement based on an assumption that the defendant had committed a crime of violence was wrong. It was subsequently shown to be wrong. So 2255 review lay. And it didn't matter that it wasn't innocence of the crime. It was innocence of the career offender status. So what you're asking for is a resentencing absent a sentencing guideline range that takes into account career offender status? Sure. And I think Maybeck, in the concluding paragraph, addressed that question and recognized there was some ambiguity in this context, but said we're remanding with instructions. And the district court, in discretion, can resentence, can order the government and the defendant to try to enter into a new agreement, and in the absence of a new agreement, could allow the government to proceed on an indictment. But the point is, in the context of a plea agreement, this court's authority recognizes that there is a miscarriage of justice exception. If there is a miscarriage of justice, the collateral, the waiver of collateral review rights is ineffective, and some remedy would lie if a serious mistake was made in saying someone committed an offense that they, by subsequent law, clearly did not commit. And the remedy, it may be a remedy that has to be discussed and negotiated.  But I think that the government would have an interest in not incarcerating somebody on the basis that they committed a prior controlled substance offense and they did not, for an extended period of time, three years or four and a half years, whatever it is. And we cite in our brief a case that says it's not a trifling thing. We're talking about fundamental concepts of liberty. It would seem to me that the government would have an interest in working this out. And 2241 is the only resort that he has at this point in order to try to work that out and get it right. All right. Judge Sanchez, you had another question? I was getting back to Dorseyville because that, I think, has been narrowly interpreted to determine that a miscarriage of justice occurred when the underlying conduct is determined to be non-criminal, which is not the case here. You are claiming innocence of a sentencing error, not the underlying conduct. Well, we deal with that. And we say to that that it's a distinction without a difference. Whether the miscarriage of justice relates to the elements of the crime of conviction or the elements of the offense that serve to enhance the sentencing makes no difference. The underlying interest to be protected is the interest in not unlawfully restraining liberty when a subsequent decision, an authoritative decision, says that liberty is being unlawfully restrained. And we do make an analogous argument in our brief to the context of when is a procedural default excused. And we do reference that in the capital sentencing context, the Supreme Court has said that a miscarriage of justice in terms of whether a sentencing factor would serve to enhance a sentence from life to death. This actually may be a good area to start with, Ms. Irwin. And then what we'll do is we'll pick up with that and then get you back on rebuttal. Thank you, Your Honor. Thank you. Thank you. May it please the Court, Laura Irwin from the U.S. Attorney's Office in the Western District on behalf of Mr. Yost, the respondent in this matter. Let's just pick up, if we could, where Ms. Schmitalski left off. You mentioned procedural, and you talked about the O'Kareri case. But isn't this case arguably not procedural, but it's actually substantive, that if career offender status is not applicable, there's a very significant difference in terms of the sentencing range? Under these facts, that's correct, but there's several points to be made with regard to that. I mean, I'll start with innocence of sentence versus innocence of your crime of conviction. But keep in mind that we still have out there the nature of the plea agreement in this case. It's the government's position, and I'll drop back for one second to say that this is how we would distinguish Sunbear and Gilbert, both of which have been vacated and are going to be heard en banc at the government's request. There is a fundamental difference between an innocence of sentence and an innocence of a conviction. A conviction is found when the government proves beyond a reasonable doubt to a jury that every element of the offense has been met. Sentencing is different. It's different in that it's by the preponderance of the evidence. There's no jury. The standard is lower, and there's a myriad of things that a district judge considers when sentencing somebody that are not found beyond a reasonable doubt. But the response to that could be that, look, a consequence of committing a crime is loss of freedom. And thus, if a sentence is much greater for a predicate offense that now no longer is considered to be a predicate offense, you've lost the possibility of getting back a significant chunk of the freedom that you gave up Had the world been different when, at least had Montanez been out perhaps, when the time of sentencing occurred in this case in 2002 or 2003? Let me start with the beginning of your statement, which is that there is some sort of grave injustice that might occur because the sentence is longer. I just said the consequence of committing a crime is that you can lose your freedom. Right. Clearly, there is a loss of freedom. And that happens whether it's a crime or a sentence. That's true. But under the sentencing provisions, if it's within the statutory maximum, and under Booker, the sentencing judge could have sentenced anywhere within that range, the mandatory minimum and the maximum, so long as it's reasonable, which is a very broad abuse of discretion review under Gall. When you have that standard that overlays, that arguable loss of additional amount of time of freedom is not significant enough to give rise to a manifest injustice that would allow jurisdiction under 2241. If they're not in it, please understand that there are circumstances in which the government believes that there could be such an injustice, for example, under the Armed Career Criminal Act, because that changes the mandatory minimums. It bumps up your minimum. It bumps up your maximum. But if a sentence is still within the statutory maximum, as is the case here, it can't give rise to jurisdiction. The error is not grave enough to give rise to jurisdiction under 2241. If there was not career offender here status, the government still would have gone forward with the 5K1.1 motion, right? Well, we probably would have. But that takes me back to what would have been my first point, which was what is dispositive of this case is the plea agreement that was entered into pursuant to Rule 11C1C, which is now Rule 11C1C. It was binding on the parties, and it was binding on the district court once it accepted it. And that agreement was a negotiated agreement between the parties. There was give and take. The government and the defendant agreed of what his sentence would be and agreed about how to come about that. And it is true that the government agreed to a two-third reduction from the top of the range. But if the government wasn't going to get the sentence that it agreed to or that it wanted, that two-thirds would have been different. And that takes me to the point of, well, before I move to my next point, under this court's authority, which I cited in my brief, Sanchez, and there's also another case, I think it's Bernard, which is a 2004 case, when there is a Rule 11C1C agreement, that essentially negates the role of the guidelines. And these were before the guidelines were advisory. It becomes the ruling construction of the plea agreement. The guidelines no longer matter. And in this case, I think that's obviously true because of the amount of reduction that was granted as a result of the 5K. A secondary point is to think about what the remedy would be for Mr. Pollard under this circumstance if the court were to set aside his plea agreement, which the district court tentatively accepted, ordered a PSR, and then accepted it at the sentencing. I mean, so it was thoroughly understood and contemplated by the district court. It wasn't as if it just automatically accepted what the government and the defendant came forward with. But by the very terms of this plea agreement, the government has the option of voiding the plea agreement, which would mean that he could lose the 5K, he could lose the stipulated amount of 30 kilograms of PCP, he'd lose his three points for acceptance and responsibility. So he's looking at a completely different lay of the land if he goes back to that. And again, the guidelines were advisory under Booker. He faced a minimum of 10 years and a maximum of life. And he could be resentenced, theoretically, to a much, much higher sentence that would qualify as reasonable under Gall. So I think that when you look at the complete picture of the plea agreement, what it provides, its nature, that it's binding under Sanchez and under Bernard. I don't have the citation, but I can get it for the court if you'd like. It's a 2004 case. This is the dispositive issue in this case, whether or not that agreement is going to be adhered to. But his argument essentially is you're saying the guideline range instead of a low range of 292 would have been, what, 235 if he was at level 4 for criminal history? Yeah, it would have been 235 to 293. And they're saying if it was level 3, it would have been, what, 210 to something? To be perfectly honest, I don't know that I'm familiar with a level 3 argument in this case. I appreciate that it may be out there. I just don't recall it. It would obviously be somewhat lower. So, in effect, what the argument is, okay, if you start with a low end of 235 and you do a 5K 1.1, I had a good chance of getting below 194 months. My response to that is I don't know that for sure. Well, in the habeas context, I think the Supreme Court has directed us, and I think it may be the Witt case, and I could be wrong and I can submit a 28J, but the important thing to think about in the habeas context is not some subjective error, what could have happened. Is there an objective error? That's the test we have to look at because of the limited nature of habeas review. So what the judge might have done, I think, is not the primary issue we need to look at. It's a practical matter. Under this plea agreement, the way it was negotiated by both parties and accepted by the judge, it was two-thirds because the government and the defendant agreed that his sentence would be 194 months. I submit to you that if this were to go back or if there had been a question about his career offender status, which, by the way, he did not contest at sentencing, he did not file a direct appeal, the government would have gotten to the sentence that it thought was reasonable and fair a different way. It wouldn't have been two-thirds of a reduction for the 5K. Yeah, that's the point that I was saying. We're not sure exactly what it is. I guess you'd almost have to do a complete do-over. Right, and I guess that takes you to, you know, if you want to go beyond Sanchez and Bernard and look at the waiver, clearly this has been decided by his sentencing court twice. He put it before his sentencing court. It's been to the Seventh Circuit. In fact, he doesn't even argue in his brief that if given the opportunity, he could show that it was involuntary or unknowingly made. He seems to concede that he has to move right to miscarriage of justice, and our position is that he can't show a miscarriage of justice. There is no error in this case. Going back to Judge Sanchez's point, there was plenty of opportunities for him to bring this. Montez is not controlling on the Seventh Circuit. It's not even, as Judge Fischer pointed out, it's not even controlling on the issue of what Ohio law means. Mr. Pauler would have you believe that he's actually innocent of that offense. Although, on that, just as a digression, if the Sixth Circuit is saying this is how you apply Ohio law for purposes of federal sentencing. Agreed. Agreed. But again, that's only persuasive authority for the Seventh Circuit. And Mr. Pauler did bring the Montez issue to his sentencing court after it was issued, and his sentencing court rejected his claim. So it has seen that claim. So it's not as if no one that had sentencing authority over him has viewed this claim. That's detailed in our brief. He did put this before them. So our position would be that you can't get to a miscarriage of justice. There's no error, because one of the considerations is clarity of the error, and we believe that it's not been uniformly decided. The Sixth Circuit opinion on this issue, while it certainly is controlling within the Sixth Circuit and it is a question of federal law in terms of what qualifies, it is not a Supreme Court decision that tells everyone about how to classify that Ohio offense. The next characteristics or quality you look for under the miscarriage of justice exception is the gravity of the error and the character of the error. And this really comes down to where we started, which was what is innocence of the sentence? What is innocence of a conviction? And our point would be, again, contrary to Gilbert and Sunbearer, that they are fundamentally different. And because of that, as long as your sentence is within the statutory maximum and as long as you could get the same sentence on remand, which he could, given that the guidelines are now advisory, he can't show a miscarriage of justice. And I think I mentioned earlier the government certainly would not take that position if it was an armed career offender in a CCA case, because that changes the game entirely. But it's our position that they are fundamentally different. And, in fact, there's an NPO from Judge Hardiman, the Kenney decision, which came out in August, I think, and I realize that NPOs are not terra firma. But he points out that Gilbert is wrongly decided because, you know, innocence of a sentence has only been decided by the Supreme Court in the death penalty context. And that's because those elements for the death penalty need to be found by a jury beyond a reasonable doubt. There is no offense of a sentence. He is not innocent of any sentencing offense. And the Supreme Court has even said these habitual offenders are add-ons that you have in the sentencing context are not additional punishment for that predicate. It is an attempt to find the best sentence for the current crime of conviction. So your first argument is, look, the plea agreement cut a deal. It was 194 months. That's correct. And everybody abided by that, and that was because it bound everyone. And then the second argument, I guess, was that there was a waiver with it. That's correct. Although that's a little bit tougher because you didn't really bring that up. Well, I — Of course, you didn't bring it up, then they didn't bring it up. So you waive the waiver, they waive the waiver, the waiver. Agreed. And the court brought it up. I'm sorry? And the court brought it up. Well, the district court did bring it up because Mr. Pollard brought it up. So we don't have the same circumstance where a party is being injured by being caught off guard on an issue. Mr. Pollard himself brought it up. But allow me to at least address the court and say that we realize we made a mistake. It was not our attempt or our desire to confuse this case any more than was already confused. It's not our finest hour. We have taken steps to try to avoid this type of problem in the future. The same goes for our 28J letter on the transfer that was in violation of FRAP 23A. We have taken steps so that that will not happen again to the best of our ability. And so I apologize for that. We take full responsibility. And it is true that we did not raise the waiver before the district court. Again, it goes to jurisdiction. So it was proper for the district court to bring it up in that regard because in 2241, I mean, that's the issue. One additional point that I'd like to make with regard to the fact that we are here on a 2241 setting is that the district court never really decided, because it didn't have jurisdiction, whether or not Mr. Pollard was entitled to relief under Montanez. So that's not a question before this court. The question before this court is did the district court correctly determine that it lacked jurisdiction over this matter? Did it correctly determine that Mr. Pollard did not meet his burden to show that his remedy under 2255 is inadequate or ineffective such that he could seek and have jurisdiction under 2241? If this court decides that the district court was wrong, it goes back for determination of whether or not there is an error to be found under Montanez, and then we run into the whole issue of what is the proper remedy given the nature of his plea agreement. Thank you. If there are no further questions, I will yield the floor. I think that he wanted to ask for rebuttal time. I don't know if he wants any rebuttal time, but he'd certainly have my remaining couple minutes. We'll give him some. Thank you. Thank you. Mr. Metusky. Thank you. Could you start off with the point about what I was asking you about, the remedy? And Ms. Irwin said, you know, if you go back, the remedy will be vacating the plea agreement, and that may not be good in the end for your client, but isn't that what you end up really asking for is a vacating of the plea agreement? If you get what you're way under 22, if you're eligible under 2241, and if you ultimately win on the merits with respect to 2241, isn't that what you get? And isn't that sort of like the old pig on ice, you don't know where it's going to stop? I met with my client on several occasions, and without revealing any attorney-client privileged communication, my client has served now, I believe, eight, eight-and-a-half years of this sentence. My client, it is not of record in this case that my client made the controlled substance offense argument. He contested his career offender status, and he contended in his initial 2255 application that he should have been sentenced as category three, and I have the guideline ranges now if they're relevant. I think we've hit the minimums correctly. He's prepared for that risk. The risk, Your Honor, is that the government is somehow going to say we should retry a case that is now eight years old, because, in fact, we were incorrect when we characterized you as a career offender over your objection, and the reasonable result is a reduction of his sentence based on the two-thirds of the lower limit of the guideline range that would have applied had we been under the correct assumption of what the law was at the time. Therein lies the miscarriage of justice, and I say again, I, for one, see very little distinction between innocence of the crime of conviction and innocence of a controlled substance offense that serves to enhance the sentence and deprive liberty for an additional three to four years, depending on who decides what the applicable guideline range would be. And Mr. Pollard is pursuing this because he feels, under Montanez, he is not a career offender. I believe my time has expired. Thank you, Your Honor. Thank you. I thank both counsel for very well-presented arguments. I think, Mr. Piotrowski, you took this case on a pro bono basis, you and your firm. We thank you immensely. You did an incredibly good job and hope someday to see you come back. It was our honor and privilege to be of service. Well, same goes for us to have you here. Thank you. Thanks, both of you. We'll take the case under advisement and call the next case.